FILED

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 SEP -1 PM 2:28

U.S. DISTRICT COURT
N.D. OF ALABAMA

JAMES H. KARR, JR. and )
AMERICAN TEACHERS SERVICES, )
INC., )
)
    PLAINTIFFS, )
)
VS. ) CV99-H-1133-S
)
INVESTORS CONSOLIDATED )
INSURANCE COMPANY, )
)
    DEFENDANT. )

ENTERED

SEP 01 1999

## MEMORANDUM OF DECISION

Pursuant to the June 8, 1999 order, as amended June 29, 1999, the June 3, 1999 alternative motions to dismiss and for summary judgment filed by defendant are now under submission. In support of the motions, defendant included therein its legal authorities and argument and attached thereto were five exhibits. In addition defendant filed its evidentiary material on July 7, 1999. On August 20, 1999 plaintiffs filed a brief with an attached affidavit with 12 exhibits attached thereto in opposition to the motions.

The complaint to which the motions are addressed was filed May 6, 1999 and contains five counts.[1]

In Count I plaintiffs seek to recover compensatory and punitive damages for alleged suppression of material facts

---

[1] A similar, related and earlier complaint was filed in this court February 8, 1999 and dismissed without prejudice March 26, 1999 (See CV99-H-293-S) which complaint, order of dismissal and memorandum of decision are exhibits A and C to the pending motions.

concerning defendants "unfair and tortious methods of selling, issuing and/or servicing the disability income insurance policies or products" sold and/or to be sold by plaintiffs under a written June 13, 1995 contract negotiated by plaintiffs and defendant between July 1994 and May 1995 (the June 13, 1995 contract).

In Count II plaintiffs seek to recover compensatory and punitive damages for misrepresentation of material facts by defendant to plaintiffs in 1994 and 1995 leading up to the execution of the June 13, 1995 contract. The misrepresented facts were "we are a top notch company" and "we do things straight up, legal and right" and "you don't have to worry about us doing things right."

In Count III plaintiffs seek to recover compensatory and punitive damages for misrepresentation of material facts in February of 1998 to the effect that when certain lawsuits against defendant were resolved the sales of its policies and products would resume.

In Count IV plaintiffs seek to recover compensatory damages for breach of the June 13, 1995 contract, but in its August 20, 1999 memorandum in opposition to the pending motions, plaintiffs concede that defendant is entitled to a granting of its motions as to Count IV.

Finally, in Count V plaintiffs seek to recover compensatory and punitive damages for selling, issuing and/or servicing the disability insurance policies and products in a "negligent, wanton, reckless and/or wrongful" manner.

2

The relevant facts surrounding this action are as follows and are undisputed unless noted to the contrary. As a result of negotiations over a period of approximately one year, James H. Karr, Jr. (Karr) entered into the June 13, 1995 contract with Investors Consolidated Insurance Company (Investors) (See Exhibit 2 to Karr Affidavit).[2] Under the contract Investors appointed Karr as a National Marketing Director of Investors, assigning him a non-exclusive territory embracing all of the United States and authorizing him to secure life, health and accident insurance policies for it. In return for this appointment, Karr agreed that all disability income insurance products sold by him or ATS would be products of Investors. The primary purpose of the disability income products to be provided by Investors and to be sold by Karr "were to provide the insured educators with a certain level of benefits for each covered day of total disability and a certain level of hospital benefits for hospital confinement resulting from a covered accident or illness, as well as certain additional income protection benefits." (Karr Affidavit ¶11). In making and accepting the appointment it was agreed that Karr was an independent contractor. A supplemental National Marketing Directors Recruiting and Production Requirements Agreement was also signed June 13, 1995 giving Karr and American Teachers Services the exclusive right to recruit agents and agencies within a designated territory of twelve

---

[2] American Teachers Services, Inc. is not a party to the contract.

3

states and the District of Columbia regarding disability coverage (See Exhibit 2 to Karr Affidavit). Prior to 1995 Karr had actively been involved in marketing insurance policies to educators for a number of years, utilizing American Teachers Services, Inc. (ATS) for that purpose since 1991. During the negotiations between Karr and Investors leading up to the June 13, 1995 contract, Karr expressed his concerns about the lawsuit climate in Alabama. Representatives of Investors told Karr that Investors was a "top notch company" and that "we do things straight up, legal and right" and that Karr would not have to "worry about us doing things right."

    Beginning in the Fall of 1997 Karr, ATS, Investors and others were named defendants in a number of lawsuits filed in Alabama (the litigation). In general the lawsuits charged fraud and violations of rules and regulations of the Alabama Department of Insurance concerning the sale of the disability income products. The litigation largely focused (and Counts I, II and V of the action largely focus) on that part of the disability income products supplied by Investors and sold by plaintiffs which provided educators coverage under a group disability policy and under a group supplemental hospital policy. Karr and ATS would obtain applications from educators for inclusion in the group policies which applications would be submitted to defendant. Karr requested that, following acceptance of the applications, the certificates reflecting that educators were insured be mailed by Investors directly to the insureds (Karr

4

Affidavit ¶12). Investors would mail two certificates to an educator, one reflecting inclusion in the group disability policy and one reflecting inclusion in the group supplemental hospital policy (Fisher Affidavit ¶17). This was done notwithstanding that a single application for both forms of coverage was used which reflected a total premium for both forms of coverage (Fisher Affidavit ¶18). Upon receipt of an application Investors apportioned the total premium indicated on the application between the disability coverage and the supplemental hospital coverage, noting such apportionment on the application.[3] Investors then mailed a copy of the annotated application and the two certificates to the insured educator (Fisher Affidavit ¶¶20 and 21). Although Karr may not have been aware that the certificates mailed to the educator reflected the breakdown of the total premium into its two components, or that the copy of the application had been annotated as described above, he was advised by defendant that a premium "would be allocated among the two different parts of the policy for in-house accounting purposes only." (Emphasis added) (See ¶7 of the June 30, 1999 Affidavit of Karr submitted in the United States District Court for the Middle District of Alabama in CA99-S-273-N, attached as a part of Exhibit E to the Fisher Affidavit.) Moreover, Investors

---

[3] It is not clear whether the apportionment noted on the applications simply reflected the amount of the total premium allocated for the disability certificate or for the supplemental hospital certificate or for both. There is no evidence that the processing of an application resulted in an educator paying a total premium larger than the one reflected on the application.

5

forwarded each month to plaintiffs monthly billings reflecting in each instance the breakdown of the total premiums for the two components of the product (Fisher Affidavit ¶21 and Exhibit C to Fisher Affidavit). Further, as early as March of 1996 Karr received a telephone call from an insured educator causing him to inquire "of Investors concerning the 'splitting' of premiums and the 'two-part' policy" (Karr Affidavit ¶14). He was told by Investors that the premium was being allocated by Investors between the two different parts (disability component and hospital income component) of the policy for in-house accounting purposes (Karr Affidavit ¶14). Thus, even if Karr was not aware of the "splitting" in 1995 as his earlier affidavit filed in CA99-S-273-N suggests,[4] he certainly was aware by March of 1996 of facts as would put a reasonable person on inquiry which would lead to the discovery of the claimed fraud. Karr states, however, that he only learned of the "splitting" after the litigation began in 1997, and for the purpose of ruling on the pending motions this court accepts that as correct.

Shortly after the litigation began in the Fall of 1997, Investors told Karr in early 1998 he needed to postpone escalating sales in Alabama and the Mobile school system until after the lawsuits were resolved (See Exhibit 10 to Karr

---

[4] The court notes that Karr used the phrase "would be allocated" rather than "are being allocated" or "have been allocated," suggesting this conversation took place prior to the formation of the June 13, 1995 contract, particularly since the "as early as 1995" portion of the statement being challenged by the affidavit is left undisputed.

6

Affidavit). Investors told Karr they could resume marketing efforts once the litigation was concluded. The litigation was concluded in March of 1998, and plaintiffs did resume marketing the disability income products but by no means in the volume accomplished prior to the litigation (Fisher Affidavit ¶¶23 and 24 and documents behind the tab marked "Exhibit E" to Fisher Affidavit; Karr Affidavit ¶9).

On June 26 and 29, 1998 Karr and ATM were advised by letters from Investors that pursuant to the June 13, 1995 contract it was discontinuing the sale of any disability or medical policy or certificate in Alabama, effective immediately. The letters instructed Karr and ATM not to accept any other applications on those lines of insurance. The letters also gave Karr and ATM thirty-days notice of termination of the June 13, 1995 contract pursuant to section 8a (See Exhibits 11 and 12 to Karr Affidavit).

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings, which it believes demonstrate the absence of a genuine

7

issue of material fact. Celotex, 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of facts, designate specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. Fitzpatrick, 2

F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the nonmoving party on the issue in question. This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the nonmoving party's case. <u>Fitzpatrick</u>, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the nonmoving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict

motion at trial based on the alleged evidentiary deficiency. However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts. Lewis v. Casey, 518 U.S. 343 (1996).

As noted earlier, in Count I plaintiffs seek to recover compensatory and punitive damages for alleged suppression of material facts concerning defendants unfair and tortious methods of selling, issuing and/or servicing the disability income product. The claim is a statutory claim under § 6-5-102, Ala. Code 1975, and it focuses on the suppression at the time of the June 13, 1995 contract was entered into of the "splitting" of the total premium as earlier described (Complaint, ¶¶ 7, 21, 22).[5] In all probability the fact that defendant intended to allocate the correct total premiums among the two basic components of the coverage applied for is not a material fact in that it is not a fact of such a nature as to induce action under the facts in this case. It may not even satisfy the requirement that the fact be an existing fact. Further, in all probability defendant is entitled to summary judgment in its favor under Count I because more than two years prior to commencing this action plaintiffs discovered facts "as would put a reasonable person on inquiry which, if pursued, would lead to discovery of the fraud." Jones v. Davis, 477 So. 2nd 285, 287 (Ala. 1985). But the court need

---

[5] The complaint also contains in ¶ 7 an allegation that defendant did not disclose at that time its failure to comply with the rules and regulations of the Alabama Department of Insurance, but there is no evidence related to that allegation and no argument in briefs addressing that allegation.

10

not address those issues as defendant is clearly entitled to summary judgment in its favor on Count I because as a matter of law defendant was not under a duty to disclose since there was no confidential relation between the parties or other particular circumstances of the case creating a duty to disclose. Stated another way, plaintiff has not come forward with any evidence even suggesting a confidential relation and has not come forward with any evidence sufficient to submit to a jury the question of whether the particular circumstances of this case required disclosure of the suppressed material fact. Crowder v. Memory Hill Gardens, Inc., 516 So. 2d 602, 604 (Ala. 1987). The evidence before the court, both undisputed and unchallenged, mandates a conclusion that there was no duty to disclose, and defendant is entitled to summary judgment in its favor as to Count I.

    Under Count II plaintiffs seek to recover compensatory and punitive damages for misrepresentations made to plaintiffs while they were negotiating in 1994 and 1995 the June 13, 1995 contract. The claim is a statutory claim under § 6-5-101, Ala. Code. The misrepresentations consist of the following statements made after plaintiffs expressed concerns about the lawsuit climate in Alabama: Investors is a "top notch company" and "we do things straight up, legal and right" and plaintiffs do not have to "worry about us doing things right." To establish a cause of action under § 6-5-101 for misrepresentation the plaintiff must establish that the statements made were representations of fact

11

and not mere statements of opinion amounting to nothing more than sales talk or "puffery." Gable v. Boles, 718 So. 2d 68, 70 (Ala. 1998); McGowan v. Chrysler Corp., 631 So. 2d 842, 846 (Ala. 1994); Kaye v. Pawnee Construction Company, Inc., 680 F.2d 1360 (11th Cir. 1982). These statements were no more ones that a person may reasonably treat as a fact than statements made by a car salesman to a prospective purchaser that the car is "a good car" and is "in good shape," Scoggin v. Listerhill Employees Credit Union, 658 So. 2d 376 (Ala. 1995); is "as good as a new car," Young v. Serra Volkswagen, Inc., 579 So. 2d 1337 (Ala. 1991); or is "in good condition," Pell City Wood, Inc. v. Forke Bros. Auctioneers, Inc., 474 So. 2d 694 (Ala. 1985). Also see O'Connor v. Scott, 533 So. 2d 241 (Ala. 1988) (statement that the "house is structurally sound," or "the appliances are in proper working order" is a statement of opinion). The representations upon which Count II is based being nothing more than statements of opinion, defendant is entitled to summary judgment in its favor as to Count II.[6]

Under Count III plaintiffs also seek to recover compensatory and punitive damages for misrepresentations made to plaintiffs in February of 1998 that as soon as the lawsuits against defendant were resolved the sale of defendant's disability policies and products would resume. Like the claim under Count II, this claim is also under § 6-5-101, Ala. Code. Unlike the claim under Count

---

[6] This conclusion eliminates the need to discuss defendant's viable defense of the statute of limitations under Count II.

II, the statement serving as the basis for Count III is not of a material *existing* fact, as required for a viable claim under § 6-5-101. Crowder, supra at 604. Rather it is a representation made as to future events. A claim predicated upon representations made as to future events has been explained by the Alabama Supreme Court as follows:

> If one makes a statement regarding an event to take place in the future, obviously the statement should ordinarily be regarded merely as an expression of opinion, and the court will frequently stop at this point and hold that such a statement cannot serve as a basis on which to predicate fraud. But if there are circumstances tending to show an actual fraudulent intent at the time the promise or representation regarding a future event is made, then the situation is entirely changed. According to the weight of authority, if the person making the promise or statement as to a future event is guilty of an actual fraudulent intent, and makes the promise or misrepresentation with the intention of deceiving and defrauding the other party, and accomplishes this result, to the latter's injury, fraud may, under many circumstances, be predicated thereon, notwithstanding the future nature of the representations.

Scholz Homes Inc. v. Hooper, 254 So.2d 328, 332-333 (Ala. 1971) (quoting Shepherd v. Kendrick, 236 Ala. 289, 181 So. 782 (1938). Thus, when a misrepresentation relates to an act to be performed in the future, it must have been made with the intent to deceive and there must have been, at the time the representation was made, an intent not to do the thing promised. Gorham v. Glendean Drugs, Inc., 628 So. 2d 499, 500 (Ala. 1993). There is no evidence of an intent to deceive when the statement was made. There is no evidence that at the time the representation was made defendant intended not to resume the sale of defendant's disability policies and products. Indeed, there is undisputed

13

evidence that when the litigation concluded, the sales by plaintiffs did resume, albeit with a significantly lower volume than before the litigation began. The court is satisfied that defendant's motion for summary in its favor as to Count III is due to be granted.

Under Count V plaintiffs again seek to recover compensatory and punitive damages based upon defendant selling, issuing and/or serving the disability insurance policies and products in a negligent, wanton, reckless and/or wrongful manner. The primary focus of this claim is the "methods by which Defendant issued policies and/or certificates of insurance." Before plaintiffs can state a claim or prevail on a claim based upon negligent or wanton conduct in the performance of the June 13, 1995 contract, there must be a duty owing by defendant to them. While there is a narrow area of Alabama law which authorizes a tort claim for misfeasance in the performance of a contract, in order for the ex delicto action to be maintained, the duty which gives rise to the ex delicto action must be "a duty collateral to the contract."  C & C Products, Inc. v. Premier Industrial Corporation, 275 So. 2d 124, 130 (Ala. 1972).[7] The wrongs alleged as the basis for the tort claim in Count V do not arise out of "a duty collateral to the contract." Morever, and equally as significant, there is simply no evidence of negligent or

---

[7] The duty in this case arises, if at all, only out of the June 13, 1995 contract. As earlier noted, plaintiffs concede that defendant is entitled to a granting of its summary judgment motion as to the Count IV breach of contract claim.

14

wanton conduct by defendant in the sale, issuance and/or servicing of the disability insurance policies and products, which activity forms the basis for the claim in Count V. Further, the injuries claimed by plaintiffs are not personal injuries and the contract involved is not a contract of insurance, essentially the only areas where the Alabama Supreme Court has even found the tort to exist. For each of these reasons, separately, the court is satisfied that defendant is entitled to summary judgment in its favor as to Count V.

There being no dispute as to any material fact, defendant is entitled to a judgment in its favor in this action. A separate final judgment will be entered.

DONE this 1st day of September, 1999.

*[signature]*
SENIOR UNITED STATES DISTRICT JUDGE